Filed 7/19/16  In re I.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.G., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064961 |
| Plaintiff and Respondent, | (Super.Ct.No. J254481) |
| v. | OPINION |
| R.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn Poncin, Judge.  Affirmed.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant R.G.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant A.K.

1

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

Defendants and appellants R.G. (Mother) and A.K. (Father) appeal from the juvenile court's order terminating their parental rights as to their four-year-old daughter I.G. (the child). On appeal, Mother argues the juvenile court erred (1) in denying her Welfare and Institutions Code[1] section 388 petition; (2) in failing to find the beneficial parent-child relationship exception to termination of parental rights applied; and (3) in finding the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) did not apply. Father's sole contention on appeal is that the juvenile court should have granted him, as the biological father of the child, presumed father status under the standards enunciated in *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).[2]

Having carefully considered the arguments advanced by Mother and Father, we reject their claims and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of San Bernardino County Children and Family Services (CFS) in April 2014 after a referral was received stating Mother was being arrested on suspicion of being under the influence of methamphetamine. Mother and the

_____

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Mother also joins in and adopts arguments raised by Father in his opening brief to the extent the arguments inure to her benefit.

2

then two-year-old child lived with the maternal grandfather.[3] Law enforcement reported that Mother had been screaming, throwing things, and making sexual and "weird" statements to her father; and that they were placing Mother on an involuntary mental hold pursuant to section 5150.

Mother did not want the child to reside with her father because she believed he was violent and gave the child a black eye. She agreed to place the child in foster care, and denied a history with mental illness or substance abuse. However, the maternal grandfather reported that Mother had four episodes of hearing voices. Mother also had a history with child welfare services related to her absence and incapacity and several arrests in 2010 and 2014 for disorderly conduct and being under the influence of drugs. The child was found to be dirty with matted hair and bruises on her thighs and was taken into protective custody. Mother provided the name of the child's father but neither she nor the maternal grandfather knew his whereabouts. Father was not present at the child's birth. Mother also noted that she had Indian heritage through the Cherokee tribe.

On April 28, 2014, a petition on behalf of the child was filed pursuant to section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).

The detention hearing was held on April 29, 2014. Although she had been released from custody, Mother was not present at the hearing. The maternal grandfather

---

[3] The detention report and the parties at the detention hearing incorrectly referred to the maternal grandfather as the "paternal grandfather." The detention report identifies the grandfather as Mother's father, and counsel for CFS later clarified the issue in open court at the detention hearing.

was present, and stated the child had lived with him since she was born.[4]  The maternal

grandfather also informed the court that he had never met the child's father; that Father

lived in the Hollywood area; that Father was not involved in the child's life nor had he

ever visited the child; and that there was a court order against Father for child support

that was being paid to Mother.  The child was formally detained and maintained in foster

care.  Mother was provided with supervised visitation one time a week for one hour.

Upon the maternal grandfather's request, the court ordered CFS to assess the maternal

grandfather for relative placement and advised the maternal grandfather he could not be

considered for placement while Mother continued to reside with him.

The social worker attempted to contact Mother on May 7 and 12, 2014.  The

maternal grandfather reported that Mother left his residence; that he did not have a

physical address for Mother; that Mother resided somewhere in Hollywood; and that

Mother may be having a mental breakdown.  Mother's whereabouts were unknown.

Father's whereabouts were discovered in May 2014.  A May 2014 due diligence

report indicated Father resided in Los Angeles County and had been in jail.  Father was

incarcerated since April 2013, and was in the custody of the United States Immigration

and Customs Enforcement (ICE), at a detention center in Adelanto.  CFS sent Father

notice of the jurisdictional/dispositional hearing on May 21, 2014.  A proof of service

indicated Father was personally served for the June 2014 jurisdictional hearing in May

2014; the exact date of service was however omitted.  A signature noted "T. Brown,

---

[4] The maternal grandfather later reported that he cared for the child "24/7" more than six months prior to the child's detention.

D.O." served Father at the ICE facility, and was dated May 20, 2014. A declaration by CFS incorrectly stated American Eagle Attorney Services provided the notice, and returned an unsigned copy of the proof to CFS.[5] A second unsigned copy of a proof of service bearing T. Brown's name indicated Father was personally served for the June hearing on May 20, 2014.

The social worker recommended the allegations in the petition be found true and that Mother be provided with reunification services. The social worker also recommended that Father be found an alleged father not entitled to services.

On June 16, 2014, search efforts for Mother were continuing. The maternal grandfather reported Mother had a bench warrant in Los Angeles County, and was likely in the Hollywood area, where she stayed at homeless shelters. The court continued the jurisdictional/dispositional hearing to June 27, 2014, so CFS could locate Mother. Father was reportedly in federal custody.

The contested jurisdictional/dispositional hearing was held on June 27, 2014. Neither parent was present; however, the maternal grandfather was present and again requested visits and placement of the child. The court ordered CFS to provide an

---

[5] "T. Brown, D.O." is not an American Eagle process server, but a "Deportation Officer" (D.O.) at the ICE facility. T. Brown signed the proof of service and the form was not unsigned. T. Brown evidently kept the original proof and faxed a copy to CFS, as evidence by a facsimile header on the document.

assessment report of the maternal grandfather for placement.[6] CFS completed noticing for Mother, but her whereabouts were unknown, and Father reportedly remained in federal custody. Father's counsel objected with no affirmative evidence as to "father's status as well as to no services." The court found the allegations in the petition true as amended and declared the child a dependent of the court. The court found Father to be an alleged father not entitled to services and provided Mother with services. Mother's case plan required her to complete a psychological evaluation; take any prescribed medication; attend general counseling, a domestic violence program, a parenting program, an outpatient substance abuse treatment program, a 12-Step program; and randomly drug test.

On July 29, 2014, Mother visited CFS's office and spoke with a social worker. The social worker went over the case plan with Mother, gave Mother a copy of her case plan, and provided Mother with referrals. Mother was ordered to randomly drug test but did not attend tests between October and December 2014. Mother claimed that she was enrolled in counseling and began attending a domestic violence program. However, she failed to provide verification of her attendance to CFS. Mother regularly attended her supervised visits with the child weekly for one hour and the visits were reported as being positive. The child was initially reluctant but after a few visits, she welcomed the visits

---

[6] On July 2, 2014, the court granted the maternal grandfather's request for de facto parent status of the child. On August 12, 2014, CFS reported that the maternal grandfather's relative assessment had been approved.

with Mother. The two were bonding and Mother had displayed positive parenting skills while interacting with the child.

Mother received a psychological evaluation in November 2014. She reported that she had received some mental health treatment in the past and saw a psychiatrist when she was young. She admitted to having used alcohol, marijuana and methamphetamine in the past on occasions; however, the psychologist believed Mother minimized her drug use. She also reported that she had been unemployed since 2012, due to her criminal history, and remained unemployed, relying on family for financial support. Mother also stated that she had been arrested thrice for battery, but claimed she did not commit those crimes. The psychologist found Mother had anxiety, suggestive of a diagnosis of unspecified, and believed Mother had "little control over her current emotional state," and her ability to parent was questionable. The psychologist also noted Mother was a poor historian, her account of her history conflicted with other sources, she was vague as to the details of her life, and she was "emotionally fragile." The psychologist concluded Mother did not have the capacity to safely and effectively care for her child at that time.

Despite Mother's minimal progress, the social worker recommended an additional six months of services. The six-month review hearing was held on December 30, 2014. Mother was present and submitted on CFS's recommendation. Father was not present. The court found Mother had made minimal progress in her case plan and ordered an additional six months of services for Mother.

By the time of the scheduled June 29, 2015 12-month review hearing, the social worker recommended terminating Mother's services and setting a section 366.26 hearing.

In late January/early February 2015, Mother began missing her counseling sessions, was a no show for random drug testing, and stopped visiting the child. Mother completed six of eight general counseling sessions, but was terminated on February 23, 2015, for excessive absences and no shows. She attended five of 12 parenting education classes, but was terminated on January 22, 2015, for excessive absences and no shows. Mother informed staff that she left because she was stressed out. Mother reported that she had attended domestic violence sessions and an outpatient substance abuse program. However, she could not provide proof of attendance or recall the name of the domestic violence program or dates of attendance for the substance abuse program. In addition, although she tested negative for drugs on January 9 and 15, 2015, and February 10, 2015, she was a no show on subsequent tests from March through May 2015. She also reported that she had been attending Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings.

Moreover, Mother failed to keep in contact with CFS, and did not contact CFS until May 2015. Mother stated she was taking medication for stress and anger and denied being diagnosed with any mental illness, despite being admitted to a hospital. Mother also reported that she stayed with friends, was homeless, and was transported by law enforcement to homeless shelters after her hospital stay. The maternal grandfather reported Mother had been staying with him since March 25, 2015, but was looking for a place for Mother so that the child could be placed in his care. Mother attended 10 visits with the child and was reported to be appropriate, affectionate, and used good parenting skills. Her last visit with the child was on February 27, 2015. Mother did not contact

8

CFS until May 2015, and received a visit on May 26, 2015. The social worker noted Mother appeared to follow her case plan for short periods of time, had appropriate visits, and appeared to love her child, but was incapable of providing a safe environment and basic needs for herself or her child.

Meanwhile, the child had been placed with her caregivers since her removal on April 24, 2014, and had adjusted well in the home. The child appeared at home with her caregivers and asked for her wants and needs. The caregivers, who were open to adopting the child, were loving toward the child and appeared to treat her as a member of their family. The social worker noted that further assessment of the maternal grandfather's home was still needed due to Mother apparently residing in his home and Mother's statement that she did not want the child placed with the maternal grandfather. When Mother contacted the social worker in May 2015, Mother again expressed her concerns with placing the child with the maternal grandfather, noting she did not want the child placed in his care. Father had been incarcerated for most of the reporting period but had been released from federal custody. In May 2015, Father, through an Armenian interpreter, contacted the social worker, requesting visits with the child. The social worker instructed Father to contact his attorney.

Father made his first appearance in court on June 15, 2015. His counsel requested an Armenian interpreter, and informed the court that she was not aware there was a language issue. The court set trial for the contested 12-month hearing for June 22, 2015, and requested an Armenian interpreter for Father.

9

The contested 12-month review hearing was held on June 22, 2015. Father received assistance of an Armenian interpreter. The parents objected to the setting of a section 366.26 hearing, but presented no affirmative evidence. At the request of Father's counsel, the court ordered a paternity test, and granted supervised monthly visits to Father if Father was found to be the child's biological father. The court thereafter terminated Mother's services, set a section 366.26 hearing for October 21, 2015, and informed the parents of their appellate writ rights.

On June 26, 2015, Mother filed a notice of intent to file a writ petition. However, no extraordinary writ petition was filed.

The result of the paternity test showed Father was the child's biological father. On July 27, and again on August 6, 2015, the court found Father to be the child's biological father.

In a section 336.26 report dated October 21, 2015, the social worker recommended that parental rights be terminated and that the child be freed for adoption. The social worker noted that the child had been in her caregiver's home since the child's detention on April 24, 2014; that the child was three and one-half years old; and that the child was developing emotionally, mentally and physically. She was described as having excellent communication skills and very intelligent. Her caregivers read to her daily, played educational videos for her, and stimulated her with age-appropriate toys. They were described as loving, caring, and nurturing individuals. The child had made a positive adjustment to her caregivers and the caregivers were continuing to meet the child's social, developmental, educational, medical, and emotional needs. The caregivers were

bonded to the child and had expressed a strong desire to adopt her. The child was mutually attached to her caregivers and their biological daughters, and recognized her caregivers as her parental figures.

Mother attended 15 weekly hour-long supervised visits with the child since the June 2015 review hearing. Mother had been appropriate during the visits, and had been observed giving praise to the child, teaching her how to make her swing go higher, and helping her with her sandwich. Father had attended two supervised visits with the child. He appeared happy to see the child, and often kissed her, so much so, that the child told him to stop kissing her. To which Father replied, "you are my life." Father also brought the child a gold cross necklace, clothes, and a teddy bear.

On October 26, 2015, Mother filed a section 388 petition, requesting reinstatement of her services and liberalized visits, with supporting documents. Mother stated that she had nearly completed her case plan since the termination of her services on June 22, 2015. She claimed that she had completed a 12-session parenting program, a 12-session domestic violence program, she was participating in a 12-step program, a perinatal/substance abuse mental health care program, individual therapy, and group counseling sessions. A progress report by a therapist stated that Mother had completed nine of 12 therapy sessions; and she was "working on improving the quality of her personal life," "learning how to develop coping strategies," and realizing the value of being free from chemical and alcohol dependency.

On October 29, 2015, Father filed a section 388 petition, requesting the court to elevate his paternity status to "presumed" status and order reunification services to him

11

so he could work on regaining custody of the child. Father alleged that since his release from custody, he had engaged in services on his own, had completed a domestic violence batterer's program, had made every effort to visit the child, and had a lot of family and community support. He also alleged that it would be in the child's best interest to maintain and foster her relationship with her father. In support, Father attached a letter from his pastor indicating he was a wonderful man. Father also attached a document showing he had enrolled in a domestic violence batterer's program in Los Angeles County on June 16, 2014, and completed the program on June 3, 2015. He also attached another document indicating that on November 3, 2015, Father attended one of 52 court-ordered parenting classes.

CFS recommended the petitions be denied. The social worker noted that Mother had not completed her case plan, had no stable home, and a psychological test found she did not have the capacity to safely and effectively care for her child. In regard to Father, the social worker noted Father also failed to establish stable housing; Father was not present at the child's birth and Mother did not know his whereabouts; and that Father was found in federal custody. The social worker did not know why he was incarcerated, for how long, when he was released, and if he had any contact with the child prior to contacting the social worker in May 2015. The social worker further indicated that the child has been with her caregivers for 19 months; that the child deserved permanency; and that the child had a strong bond with her caregivers, who continued to meet her needs.

12

On December 9, 2015, the court held a combined sections 388 and 366.26 hearing. Regarding the section 388 petition, Mother's counsel argued, if Mother testified, Mother would address the insight Mother gained from services, and testify about her visits with the child. CFS's counsel asked the court to deny the request because Mother had failed to demonstrate a prima facie case. The court found Mother lacked evidence she alleviated the concerns that brought the child to the attention of the court, such as her untreated mental illness and a lengthy period of sobriety. The court found that Mother had not met her burden of proving a prima facie showing under section 388 to grant an evidentiary hearing, noting that while Mother showed changing circumstances, she had not demonstrated a change of circumstances or that her request would be in the child's best interest.

Regarding Father's section 388 petition, his counsel argued Father had been in federal custody due to immigration issues, that the only allegation found against him was that he was in custody and his ability to parent was unknown, and that he was found to be an alleged father not entitled to services. Since that time, Father was found to be the child's biological father, completed a domestic violence program on his own, and regularly visited the child once the court ordered visits. Father asked "for a chance to show the court what he can do and to be raised to presumed status and then offered reunification services." Counsel for CFS requested the court deny the petition, noting Father lacked any evidence showing he had a relationship with the child other than a handful of visits or that he held the child out as his own and supported her. CFS's counsel also noted that Father's attendance in domestic violence classes suggested he was

13

detained for more than immigration issues and that Father's presumed status would interrupt the child's need for permanency. The court found Father had not met his burden for a prima facie showing for an evidentiary hearing and summarily denied Father's petition. The court noted that Father had enrolled in services in June 2014, but did not come to court requesting a paternity test until June 2015; that there was nothing indicating Father had a relationship with the child such that the child's best interest would be served by granting Father presumed status and ordering services for Father; and that Father had not shown his request would be in the child's best interest.

The court thereafter held the section 366.26 hearing. Mother and Father both testified. In relevant part, Mother testified that she praised the child at visits; that the child ran up to her and gave her hugs at the beginning of visits; that the child does not want to leave at the end of the visits and asks to go home with Mother; that the child calls her "mom" and wants her to carry her. Mother believed the child was extremely attached to her, claiming the child tells her she loves her and spontaneously gives her hugs and kisses. On cross-examination, Mother admitted that from late February to May 2015, she missed about three months of visits with her child; that her visits remained supervised; and that the child referred to her caregivers as "mommy" and "daddy."

Father's testimony addressed *Kelsey S.* issues and Father's section 388 petition. Father testified that he first realized he was the child's father while he was in jail when he received the notice. He attended five or six once-a-month supervised visits with the child for two hours. The child referred to him as "daddy" and although she was hesitant at first, she became closer to him. The child did not cry when the visits ended, but claimed

that she did not want to separate from him and that she gave him a kiss in the air. On cross-examination, Father gave conflicting testimony. He claimed he did not receive notice of the proceedings in jail and did not realize he was the child's father until he showed up in court. He stated that the notice was sent when he was being released from jail in April 2014, and did not know he had a notice from the court until a man he knew while in prison was released and called him in July 2014 and told him there was paperwork for Father at the jail. Father claimed the man told him he had a daughter in June 2014.

Father first saw the child in July 2015. Before the child's birth, he and Mother were together for about six months in 2011 and had a sexual relationship. He asked Mother once whether she was pregnant but could not remember when and asserted Mother never contacted him. They ended their relationship in mid-2012, and he later "found out." He acknowledged that he never supported or provided for the child but claimed he did not know there was a child. He was incarcerated in 2013 because he "had a fight with somebody" and was in federal custody from 2013 to 2014 for about one year and three months.

Following argument, the court found Father did not meet his burden of elevating his status to presumed father. The court also found that there was no exception to termination of parental rights, that neither parent demonstrated they had a beneficial relationship with the child, and that there was no showing the child would be greatly harmed if parental rights were terminated. The court concluded the child was adoptable and terminated parental rights. This appeal followed.

15

II

DISCUSSION

A.      *Mother's Appeal*

1.      Section 388 Petition

Mother argues the juvenile court abused its discretion in denying her section 388 petition. Specifically, she claims she had demonstrated a prima facie case of changed circumstances after her services were terminated and that it was in the best interest of the child to offer her further reunification services. We disagree.

Section 388, subdivision (a), permits anyone having an interest in a dependent child to petition the juvenile court for a hearing to change, modify, or set aside a previous order on the ground of changed circumstances or new evidence. A parent seeking to change an order of the dependency court bears the burden of proving by a preponderance of the evidence that (1) there is a change in circumstances warranting a change in the order, and (2) the change would be in the best interest of the child. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.) "Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citation.] In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citation.] The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

Section 388 is "an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*).) It is not enough for a parent to show an incomplete reformation or that he is in the process of changing the circumstances that lead to the dependency. "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability'. . . . [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] " '[C]hildhood does not wait for the parent to become adequate.' " ' [Citation.]" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)

The denial of a section 388 petition, as well as a summary denial of a section 388 petition, is reviewed for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460-461.) The juvenile court's ruling will not be disturbed on appeal unless the trial court has exceeded the limits of discretion by making an arbitrary, capricious, or patently absurd determination, i.e., the decision exceeds the bounds of reason. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) " ' "When two or more inferences can reasonably be

17

deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) "It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion, . . ." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.)

"The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]' " (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) "If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*Ibid.*) Having reviewed the record as summarized *ante*, we conclude the juvenile court properly exercised its discretion by denying Mother's section 388 petition.

Assuming, without deciding, Mother established a genuine change in circumstances, as opposed to merely changing circumstances (see *In re Casey D.* (1999) 70 Cal.App.4th 38, 49 (*Casey D.*)), after her reunification services were terminated, Mother failed to establish that further reunification services were in the child's best interest. " 'It is not enough for a parent to show just a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]' [Citation.] The fact that the parent 'makes relatively last-minute (albeit genuine) changes' does not automatically tip the scale in the parent's favor. [Citation.] Instead, 'a number of factors should be examined.' [Citation.] First, the juvenile court should consider 'the seriousness of the reason for the dependency. . . .' [Citation.] 'A second important factor . . . is the strength of the

18

existing bond between the parent and child. . . .' [Citation.]  Finally, as 'the essence of a section 388 motion is that there has been a change of circumstances,' the court should consider 'the nature of the change, the ease by which the change could be brought about, and the reason the change was not made before. . . .' [Citation.]  'While the bond to the caretaker cannot be dispositive . . . , our Supreme Court made it very clear . . . that the disruption of an existing psychological bond between dependent children and their caretakers is an extremely important factor bearing on any section 388 motion.' [Citation.]" (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512, italics omitted; see *Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 530-531.)

Here, the juvenile court did not abuse its discretion in finding Mother failed to establish the proposed change would be in the child's best interest.  Parent and child share a fundamental interest in reuniting up to the point at which reunification efforts cease.  (*In re R.H.* (2009) 170 Cal.App.4th 678, 697, overruled on other grounds in *John v. Superior Court* (2016) 63 Cal.4th 91, 99.)  Mother's reunification services were terminated on June 22, 2015.  By the time of a section 366.26 hearing to select and implement a child's permanent plan, however, the interests of the parent and the child have diverged.  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.)  Therefore, after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  "[I]n fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  [Citation.]  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift

19

of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

Mother failed to make a prima facie showing that providing her with an additional six months of reunification services and liberalized visits with the goal of returning the child to her care would serve the best interest of the child. The record clearly shows that the child was very bonded to her caregivers and that she was happy, well-adjusted, and thriving in her caregivers' home. The child had been placed with the caregivers when she was initially removed from Mother's care when she was two years old in April 24, 2014. The child was closely bonded to her caregivers and their two daughters, and considered part of their family. The child looked to her caregivers as her parental figures and, as Mother acknowledged, called her caregivers "mommy" and "daddy." The caregivers were committed to providing the child with a safe, loving, stable, and nurturing home.

By the time Mother filed her section 388 petition, the child had been in a stable, prospective adoptive home for about 18 months, was doing very well, and had bonded with the family. Mother's ability to successfully achieve unsupervised visitation and to then reunify with the child was extremely uncertain by comparison. Mother had a history of being repeatedly incapable of combating her substance abuse, mental health issues, and stability issues, despite having had the benefit of reunification services. In fact, Mother continued to deny having any current substance abuse issues or a mental health diagnosis, and her petition failed to address these issues. Mother did not submit evidence showing that she was randomly drug testing with negative results, or that she was in compliant with a psychotropic medication regimen. She also failed to show she had

20

stable housing, rather claiming she was in a shelter that *could* accommodate children, but presented no evidence showing the shelter *would* accommodate the child. Given that Mother's services had been terminated on June 22, 2015, the child's interest in the permanency and stability she had found outside Mother's care was paramount. Mother did not show that returning the child to her custody would benefit the child in any way. As previously noted, "[a]fter the termination of reunification services . . . 'the focus shifts to the needs of the child for permanency and stability.' " (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Those needs could best be met by letting the child be adopted by her caregivers.

It is not in the child's best interest for permanence to be delayed for an unknown or indefinite period of time, with no certainty or even likelihood Mother could progress to the point of obtaining custody of the child. Given that Mother still had unresolved substance abuse and mental health issues and instability for many years, her purported recent sobriety failed to show that she could provide the child with stability and permanency or that the requested change was in the child's best interest. (See, e.g., *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [parents' three-month rehabilitation efforts were insufficient in light of "extensive histories of drug use and years of failing to reunify with their children."]; *In re Mary G.*, *supra*, 151 Cal.App.4th at pp. 205-206 [mother being clean for four months was insufficient in light of 23-year substance abuse history]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 686 [mother being clean for 372 days was insufficient in light of her 17-year substance abuse history and two previous relapses]; *Casey D.*, *supra*, 70 Cal.App.4th at pp. 48-49 [juvenile court did not abuse its discretion

21

in finding no changed circumstances based on "the parents' extensive drug histories; pattern of maintaining drug treatment only when motivated by the desire to reunify the family and required by outside agencies; and Casey's young age[, which] meant that she was too young to be able to protect herself if the parents should relapse."].)

In sum, there is insufficient evidence that the delay in permanency planning would be in the child's best interest. As much as Mother was to be commended for her efforts to become an effective parent, the fact remained that the child could not safely be maintained in Mother's care or that Mother could provide the child with stability and permanency. Under these circumstances, we cannot conclude the juvenile court abused its discretion in denying Mother's section 388 petition without a full evidentiary hearing.

2.      Beneficial Parent-Child Relationship Exception

Mother also contends the juvenile court erred in finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(A), did not apply to preclude the termination of parental rights. We disagree.

After reunification services are terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) A hearing under section 366.26 is held to design and implement a permanent plan for the child. At a section 366.26 hearing, the court must terminate parental rights and order the child placed for adoption if it determines, under the clear and convincing standard, that it is likely the child will be adopted. (§ 366.26, subd. (c)(1).)

" 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re*

*Celine R.*, *supra*, 31 Cal.4th at p. 53; see § 366.26, subd. (c)(1).)  " 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.*, at p. 53.)  A statutory exception to the general rule requiring the court to choose adoption exists where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i); see *Casey D.*, *supra*, 70 Cal.App.4th at p. 50.)

Here, the record reflects Mother failed to maintain regular visitation with the child. After the child was detained, Mother failed to visit the child for at least three months, missing visits from late April 2014 to late July 2014.  She also missed another three months of visits with the child from late February to May 2015.  Failure to maintain regular visitation "fatally undermine[s] any attempt to find the beneficial parental relationship exception." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212; see *In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption."].)  She, however, regularly visited the child for eight months prior to the section 366.26 hearing.

Even assuming Mother's inconsistent visitation would meet the first prong, she also had to show that the child "would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)  This weighty burden requires evidence that "severing the natural parent[-]child relationship would deprive the child of a substantial, positive

emotional attachment such that the child would be greatly harmed. . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*Id*. at p. 576.) The parent-child relationship must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Id*. at p. 575.)

The parent-child relationship "exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*Id*. at p. 1350.) Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

"The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption." (*Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "[T]he *Autumn H.* language, while setting the hurdle

high, does not set an impossible standard nor mandate day-to-day contact." (*Ibid*.) "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Ibid*.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; see *In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

A parent claiming the applicability of the parent-child relationship exception has the burden of proof. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re C.B.* (2010) 190 Cal.App.4th 102, 133-134; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.) The parent must show both that a beneficial parental relationship exists and that severing that relationship would result in great harm to the child. (*In re Bailey J.*, at pp. 1314-1315.) A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion. The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a " 'compelling reason' " (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion. (*In re Bailey J.*, at pp. 1314-1315; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) A juvenile court's ruling on whether there is a " 'compelling reason' " is reviewed for abuse of discretion because the court must "determine the

25

importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption." (*In re Bailey J.*, at p. 1315, italics omitted.)

Mother argues that substantial evidence supports the conclusion that a beneficial parental relationship existed, pointing to how the child greets her at visits and her positive interactions with the child during visits. However, since it is the parent who bears the burden of producing evidence of the existence of a beneficial parental relationship, it is not enough that the evidence supported such a finding; the question on appeal is whether the evidence compels such a finding as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) As the court in *In re I.W.* discussed, the substantial evidence rule is "typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." (*Ibid*.) When, however, the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether [Mother's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a

character and weight as to leave no room for a judicial determination that it was insufficient to support a finding [in Mother's favor].' " (*Ibid*.)  Accordingly, unless the undisputed facts established the existence of a beneficial relationship as a matter of law, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed.  (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Here, there is no evidence to show the children had a "substantial, positive emotional attachment" to Mother.  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; see *In re S.B.* (2008) 164 Cal.App.4th 289, 299.)  The child had lived with Mother for the first 25 months of her young life.  However, contrary to Mother's claim, it appears she was not the primary caregiver for most of the child's life.  The maternal grandfather reported that he provided care for the child for more than six months prior to her detention.  By the time of the section 366.26 hearing on December 9, 2015, the child had resided with her caregivers for approximately 20 months and was very attached to them.  Although Mother had visited the child, showed her love to the child, and the visits went well, the evidence regarding Mother's visitation in no way showed that she occupied a parental role in the child's life.  Rather, Mother's interactions with the child appeared to be more akin to a friendly visitor or nonparent relative, such as an aunt.  It does not appear the child was particularly upset when the visitation sessions ended, or that she was particularly anxious to visit Mother.

Even if Mother had established the existence of a beneficial parental relationship, she cannot show the juvenile court abused its discretion in regard to the second component of the beneficial parental relationship exception.  The ultimate question we

must decide is whether the juvenile court abused its discretion by failing to find that termination of parental rights would be so detrimental to the child as to overcome the strong legislative preference for adoption. That decision is entrusted to the sound discretion of the juvenile court. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) We cannot find an abuse of discretion unless the juvenile court exceeded the bounds of reason. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*Id*. at p. 319.)

Here, Mother did not introduce any evidence showing the child would be greatly harmed by the termination of her parental rights. There is no bonding study or other evidence to show the child would experience detriment from permanent separation and termination of parental rights. (Compare *In re Amber M.*, *supra*, 103 Cal.App.4th 681, 689-690 [the mother presented evidence of a psychologist's bonding study, testimony of a court appointed special advocate, and statements from the child's therapist to show a beneficial relationship]; accord, *In re J.C.* (2014) 226 Cal.App.4th 503, 533-534; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.) Rather, the record supports a finding that the benefits and stability the child will receive by being placed with her caregivers outweighed any benefit inuring to the child through continuing her relationship with Mother. The child was strongly bonded to her caretakers and saw them as her parents. The caretakers loved the child as their own and were committed to providing her with a stable, loving home. They were attentive to the child's social, developmental, educational, and emotional needs, and the child looked to them for attention, comfort,

28

and security. There was no evidence to show that the child was deeply upset or cried following her visits with Mother. Instead, the record indicates that the child was attached, happy, and well bonded to her caretakers and that she was thriving in their home. There was no evidence whatsoever that the child would suffer great detriment if parental rights were terminated. Consequently, the juvenile court could reasonably conclude that termination of Mother's parental rights would have no detrimental impact on the child.

Mother asserts the juvenile court erred because the child referred to Mother as "mom," said she loved her, ran up to Mother and hugged her at visits, asked to come with her and be carried by her, and did not want to leave at the end of visits. Mother further points to her positive interactions with the child during visits. We agree there is evidence supporting a finding of a positive relationship between Mother and the child; however, there is also evidence supporting a reasonable conclusion that the child would gain a greater benefit from being placed in a permanent adoptive home. While Mother and the child had positive interactions, their bond did not rise to the level of a parent and child. "[T]his is simply not enough to outweigh the sense of security and belonging an adoptive home would provide." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) In *In re Helen W.*, the appellate court held that the parent-child relationship exception did not apply, even though the children referred to the mother as " 'Mom,' " the mother and the children loved each other, and the mother provided for the children's needs during visits. (*Id.* at p 81; accord, *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425.) In this case, the benefit the child will receive from a stable home with a caregiver, with whom she already

has a positive relationship and who meets her needs, outweighs the benefit the child might receive from maintaining a relationship with Mother.

There must be evidence that the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents" and that severance of the relationship "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  Here, there simply is no such evidence.  The record supports the juvenile court's determination that the beneficial parent-child relationship exception did not apply in this case.

3.      ICWA Notice

Finally, Mother argues reversal of the orders terminating parental rights is required because the ICWA notices were inadequate because they omitted information about the maternal great-grandmother, V.H.G., and failed to acquire the additional information from the grandfather.

CFS argues that the juvenile court's rulings concerning ICWA have long been final and Mother cannot complain at this late stage that ICWA has been violated.  In the alternative, CFS asserts it substantially complied with the ICWA noticing requirements and provided the information reasonably necessary for the tribes to make a determination as to whether the child was an Indian child.

a.      Additional background related to ICWA

At the April 29, 2014 detention hearing, the juvenile court queried the maternal grandfather about the family's American Indian heritage.  The maternal grandfather

30

advised the court that they were not registered but that his maternal grandmother, G.H. (the child's great-great-grandmother), was half Cherokee. The maternal grandfather did not know G.H.'s maiden name or date of birth. The maternal grandfather also stated that his mother, V.H.G. (the child's great-grandmother), was not registered, and that he did not know her date of birth but that he had that information at home. The court asked the maternal grandfather to provide that information to CFS. The maternal grandfather further reported that Mother did not have any American Indian ancestry on her mother's side.[7]

On May 7, 2014, CFS mailed ICWA notice (Judicial Council form ICWA-030) by certified mail, return receipt requested to the federally recognized Cherokee tribes, Mother, the Bureau of Indian Affairs (BIA), and the Secretary of Interior. In relevant part, the notice included Mother's name, Mother's current and former addresses, Mother's date of birth, the relevant tribes; the maternal grandmother's name, date of birth, the date of her death; the maternal grandfather's name, address, date of birth, and the relevant tribes; the child's maternal great-grandmothers' name; the maternal great-grandmother's name, V.H.G., and the relevant tribes; and the names of the child's maternal great-grandfather's noting they were deceased. No other information was provided for V.H.G., and did not include her date of birth. Father's "legal" and "AKA" names and his date of birth were also included. Concerning other details on the ICWA notice, CFS noted, "No information available." A CFS staff member indicated in a

---

[7] The child did not have any American Indian ancestry on her father's side.

declaration, signed under penalty of perjury, that she provided all the information she/CFS had about the child's relatives on the ICWA form.

On May 15, 2014, CFS filed a due diligence report that included a copy of the ICWA notice, the section 300 petition, and certified mail receipts. On June 13, 2014, CFS filed a second ICWA due diligence declaration with attached certified mail receipts indicating the three Cherokee tribes, the Secretary of the Interior, and BIA received the ICWA notice in mid-May 2014. The declaration also included correspondence from the United Keetoowah Band and Eastern Band of Cherokee Indians indicating the child was not registered with those tribes nor was eligible to register.

On June 25, 2014, CFS filed a third ICWA due diligence declaration with an attached correspondence from the Cherokee Nation of Oklahoma (Cherokee Nation). The Cherokee Nation found none of the relative names stated in the ICWA notice reflected membership in the tribe. CFS reported ICWA noticing had been complete and that no confirmation of membership had been received.

On July 25, 2014, CFS filed an "ICWA Findings and Orders" report, advising the court that 65 days had passed since the tribes, BIA and Secretary of Interior had been notified of the proceedings; and that no affirmative responses of tribal membership was received, and hence, ICWA did not apply. The court signed the proposed order, finding ICWA did not apply. Neither party objected to the finding.

The December 30, 2014 six-month review report informed the parties that ICWA notice was completed and that the court found ICWA did not apply. Mother made her first court appearance at the December 30, 2014 six-month review hearing and completed

a parental notification of Indian status form. In the form, she indicated she "may have Indian ancestry" and noted the Cherokee tribe. No party raised concerns at the six-month review hearing as to the ICWA notices that had been mailed.

The June 15, 2015 12-month review report again informed the parties and the court that ICWA notice was completed, and the court had found ICWA did not apply. At the June 22, 2015 12-month review hearing, both parents were present and no party raised any concerns as to the ICWA notices that had been mailed.

On August 4, 2015, CFS filed a fourth ICWA declaration of due diligence, with a second ICWA notice attached, and copies of certified mail receipts indicating the three federally recognized Cherokee tribes, the Secretary of Interior, and the BIA received the notices in mid- to late-June 2015. The second ICWA notice was nearly identical to the first ICWA notice, except the second notice included Father's Los Angeles address. As with the first ICWA notice mailed by CFS staff, the second ICWA CFS clerk indicated she provided all of the information she/CFS had about the child's relatives. The three Cherokee tribes again indicated the child was not an Indian child and that the tribes would not intervene.

On September 2, 2015, CFS filed a second "ICWA Findings and Orders" report, advising that 65 days had passed since the tribes, the BIA and Secretary of Interior had again been notified of the proceedings and that no affirmative response of tribal membership had been received, and, hence, ICWA did not apply. The court signed the proposed order finding ICWA did not apply. Again, no party objected to the finding.

33

In an October 21, 2015 section 366.26 report, CFS advised that ICWA noticing was completed and the court found ICWA did not apply.  At the December 9, 2015 section 366.26 hearing, no party argued any ICWA issues or noted the ICWA notices had been inadequate.

b.  Legal background

"Congress enacted ICWA to further the federal policy ' "that, where possible, an Indian child should remain in the Indian community. . . ." ' [Citation.]" (*In re W.B.* (2012) 55 Cal.4th 30, 48.)  "In certain respects, California's Indian child custody framework sets forth greater protections for Indian children, their tribes and parents than ICWA.  [Citations.]  Both federal and state law expressly provide that if a state or federal law provides a higher level of protection to the rights of the parent or Indian guardian of an Indian child, the higher standard shall prevail.  [Citations.]" (*In re Jack C.* (2011) 192 Cal.App.4th 967, 977.)

Under ICWA, whenever "the court knows or has reason to know that an Indian child is involved," notice of the proceedings must be given to "the parent . . . and the Indian child's tribe. . . ." (25 U.S.C. § 1912(a).)  "If the identity . . . of the . . . tribe cannot be determined," the notice must be given to the BIA.  (*Ibid*.; see 25 C.F.R. § 23.11(b), (c).)  "The juvenile court ' "needs only a suggestion of Indian ancestry to trigger the notice requirement." ' [Citation.]" (*In re J.M.* (2012) 206 Cal.App.4th 375, 380.)

Under federal regulations implementing ICWA, as well as under state law, the notice must include the names (including maiden, married, and former names), current

and former addresses, birthdates, places of birth and death of the child's parents, grandparents, and great grandparents, "if known." (25 C.F.R. § 23.11(a), (d); Welf. & Inst. Code, § 224.2, subd. (a)(5)(C).) Under state law, "[p]roof of the notice, including copies of notices sent and all return receipts and responses received, shall be filed with the court . . . ." (Welf. & Inst. Code, § 224.2, subd. (c).)

State law further provides that, "[t]he court [and the] county welfare department . . . have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . has been[] filed is or may be an Indian child . . . ." (§ 224.3, subd. (a); see Cal. Rules of Court, rule 5.481(a).) "If the court [or] social worker . . . knows or has reason to know that an Indian child is involved, the social worker . . . is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members . . . ." (§ 224.3, subd. (c).)

"The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings. [Citation.] We review the trial court's findings for substantial evidence. [Citation.]" (*In re E.W.* (2009) 170 Cal.App.4th 396, 403-404.)

"A notice violation under ICWA is subject to harmless error analysis. [Citation.] 'An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error.' [Citation.]" (*In re Autumn K.* (2013) 221 Cal.App.4th 674, 715.)

Assuming without deciding that mother has not forfeited her ICWA contention (cf. *In re Pedro N.* (1995) 35 Cal.App.4th 183; *In re Marinna J.* (2001) 90 Cal.App.4th 731), we reject mother's claim on the merits.

### c.    Substantial evidence of ICWA compliance

We turn, then, to whether there has, in fact, been an ICWA notice violation.

" 'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1525.) "Mere support for a contrary conclusion is not enough to defeat the finding [citation]; nor is the existence of evidence from which a different trier of fact might find otherwise in an exercise of discretion [citation]." (*In re H.E.* (2008) 169 Cal.App.4th 710, 724.)

Here, at the detention hearing, the grandfather advised the court his maternal grandmother, G.H., (the child's great-great-grandmother) was half Cherokee. The grandfather did not know G.H.'s maiden name or her date of birth.[8] The grandfather also

---

[8] The ICWA does not require information relating to a child's great-great-grandparents. Aside from information about the hearing and the tribe's right to intervene in the dependency proceedings, the BIA Guidelines state notice to a tribe "shall include the following information, if known: [¶] (1) Name of the Indian child, the child's birthdate and birthplace. [¶] (2) Name of Indian tribe(s) in which the child is enrolled or may be eligible for enrollment. [¶] (3) All names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information. [¶] (4) A copy of the petition, complaint or other document by which the proceeding was initiated." (25 C.F.R. § 23.11(d).)

informed the court that his mother, V.H.G. (the child's great-grandmother) was not a registered member of the tribe and that he did not know her date of birth, but that he had the information at home. The court asked the grandfather to provide that information to CFS. The ICWA notices omitted V.H.G.'s date and place of birth as well as her date and place of death, instead noting, "No information available." The notice thus did not include all of the information that CFS was supposed to include, "if known." (25 C.F.R. § 23.11(a), (d).) However, two CFS staffers stated, under penalty of perjury, that no other information was available. The federally recognized Cherokee tribes did not request additional information, and all found the child was not an Indian child pursuant to the ICWA. This was substantial evidence that the notice complied with ICWA requirements.

Mother argues that CFS evidently did not follow up with the maternal grandfather to obtain V.H.G.'s date of birth. Mother also speculates that if CFS had followed up with Mother or the maternal grandfather, it could have obtained V.H.G.'s date of birth to complete the notice requirements. The failure to list V.H.G.'s date of birth was harmless error, however, because the notices included other pertinent information relating to V.H.G., such as her first, maiden, and married names.

Moreover, it is possible that the maternal grandfather did not know his grandmother's (V.H.G.'s) date of birth. It is equally possible Mother did not know the omitted information, considering V.H.G. is her great-grandmother. Some children and grandchildren simply do not know information relating to their grandparents or great-grandparents birthdates or birthplaces, especially from years ago or if they have no

37

contact with past generations. It is also possible that the maternal grandfather was evasive or uncooperative and simply claimed that he did not know. "On appeal, '[t]estimony may be rejected only when it is inherently improbable or incredible, i.e., " 'unbelievable per se,' " physically impossible or " 'wholly unacceptable to reasonable minds.' " [Citations.]' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786.) The CFS's staffers' declarations here were not incredible.

It would be pure speculation to assume that the maternal grandfather or Mother had any additional information about the child's Indian ancestor. If Mother had raised the ICWA notice issue in the juvenile court, she could have subpoenaed CFS employees and questioned them about their efforts (or lack thereof). In that event, of course, CFS could also have introduced additional evidence to show that it made an adequate inquiry. Instead, Mother lay in wait and did not spring this issue until the matter was on appeal. At this point, she must take the record as she finds it. As long as there is substantial evidence of ICWA compliance, the fact that CFS did not introduce additional evidence is irrelevant.

We therefore conclude that Mother has not demonstrated any prejudicial error.

B.     *Father's Appeal*

Father argues the juvenile court should have granted him *Kelsey S*. status. Specifically, he contends that under *Kelsey S.*, *supra*, 1 Cal.4th 816, he should have been treated as a presumed father for purposes of determining his entitlement to reunification services. According to Father, he did not know of the child's existence and, when he

ultimately did learn about the child, he immediately appeared in court and attempted to assert his parental rights to her.

Under the dependency statutes, presumed fathers have far greater rights than biological fathers. (*In re Zachariah D.* (1993) 6 Cal.4th 435, 448-449 (*Zachariah D.*); *In re J.L.* (2008) 159 Cal.App.4th 1010, 1018.) Only a presumed father is entitled to reunification services under section 361.5 and custody of his child. (*Zachariah D.* at p. 451; *In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.)

Under Family Code section 7611, "a man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he both 'receives the child into his home and openly holds out the child as his natural child.' [Citation.]" (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051, italics omitted, citing Fam. Code, § 7611, subd. (d).) In order to demonstrate a full commitment to his parental responsibilities, the biological father must immediately attempt to assume full parental responsibilities as soon as he reasonably knows of the pregnancy. (*In re Julia U.* (1998) 64 Cal.App.4th 532, 541.)

Father relies almost exclusively on *Kelsey S.* to support his claim that the juvenile court erred by denying him presumed father status. The Supreme Court in *Kelsey S.* held that Civil Code "section 7004, subdivision (a) and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.

39

If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849, italics omitted.) Hence, a man may attain presumed father status even if the mother thwarts his efforts if he at least initiates prompt legal action to seek custody of the child. (*Id.* at pp. 825, 849; see also *Zacharia D.*, *supra*, 6 Cal.4th at p. 450, fn. 19.)

This case presents a different circumstance than *Kelsey S.* given the belated stage of the dependency process in which the presumed father issue was raised. (See *Zacharia D.*, *supra*, 6 Cal.4th at p. 453.) " '[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' [Citation.] 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue. Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.' [Citation.]" (*Id.* at p. 447.)

"*Zacharia D.* held that biological fathers who appear after the end of any reunification period must file a section 388 petition to revive the issue of reunification services. [Citation.]" (*In re Vincent M.* (2008) 161 Cal.App.4th 943, 956 (*Vincent M.*).) The court noted that it was not presented with the issue of a father who comes forward " 'early in the dependency process, and who displays a commitment consistent with the

40

standard set forth in *Kelsey S.*,' " but is thwarted from achieving presumed father status by the mother. (*Id.* at p. 958.)

*Vincent M.* followed *Zacharia D.* and also held that a biological father's " 'only remedy' " to assert paternity and receive reunification services after the expiration of the reunification period is to file a section 388 petition to modify. (*Vincent M.*, *supra*, 161 Cal.App.4th at pp. 954-955.) The *Vincent M.* court expressly stated, "The section 388 petition will not be granted unless there are changed circumstances or new evidence demonstrating it is in the child's best interest to grant reunification services or custody." (*Id.* at p. 955.)

Here, the court terminated Mother's reunification services at the 12-month review hearing on June 22, 2015, and set a section 366.26 hearing to establish a permanent plan for the child. At that point, under *Zacharia D.*, the focus of the proceedings shifted from promoting the parents' interests in reunifying with the child to the child's interest in a stable and permanent home. (*Zacharia D.*, *supra*, 6 Cal.4th at p. 447.) Accordingly, Father thereafter filed a section 388 petition, arguing there were changed circumstances and it was in the child's best interest for him to attain presumed father status and receive reunification services so he "may work on regaining custody" of the child.

Father does not analyze this issue under *Vincent M.* or argue that *Zacharia D.* and *Vincent M.* do not apply here. Instead, he merely asserts he qualified as a *Kelsey S.* father. We reiterate that *Vincent M.* provides support for filing a section 388 petition even if seeking custody or presumed father status.

41

The juvenile court did not abuse its discretion by refusing to find that Father was the presumed father. It appears Father waited more than a year before making a request for custody or make any effort to assume parental responsibility of the child. Father gave conflicting testimony and asserted he learned of the child's existence between April and July 2014, by which time he had been released from jail, but did not contact CFS until May 2015. Father had unprotected sex with Mother and did not present evidence that he had tried to determine whether this resulted in a pregnancy. In the context of the proceedings here—the child had been in the dependency proceeding since April 2014—there simply was nothing to support that Father should be granted *Kelsey S.* status. Hence, there was support for the juvenile court making its determination denying Father's request to raise his paternity status to presumed father pursuant to a section 388 petition.

As previously noted, to succeed on a section 388 petition, a petitioner must establish "by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

Here, Father came forward at the June 2015 12-month review hearing where Mother's reunification services had been terminated and a section 366.26 hearing had been set. At that time, Father presented no affirmative evidence and did not admit

42

paternity but wanted paternity testing. Father was sent notice of the proceedings in May 2014 to a facility in Adelanto. He testified that he was released from jail in April 2014. He also testified that he became aware of the child's existence in June or July 2014 after a fellow inmate informed him he had a daughter after his release from jail. Father did nothing until May 2015 when he contacted the social worker and requested a visit with the child. There is nothing in the record pertaining to Father's living situation, his ability to care for the child, or his background.

On the other hand, by the time Father came forward, the child had been with her caregivers, who were willing and able to provide a permanent home for the child, for over a year. And, by the time of the section 388 hearing, the child had been with her caregivers for about 19 months. The child was attached to her caregivers and looked to them as her parental figures. Indeed, she called her caregivers "mommy" and "daddy." The child's caregivers were mutually attached to the child and treated the child as a part of their family while providing her with stability. The juvenile court did not abuse its discretion by concluding it was not in the child's best interest to elevate Father's paternity status to presumed and provide him with reunification services.

Father purports to contend that the juvenile court could not terminate his parental rights at the section 366.26 hearing because his rights could not be terminated unless there was a finding that he was a unfit parent and that a failure to consider he was an unfit

43

parent prior to terminating his parental rights violated his rights to due process.[9]

However, after denying Father's section 388 petition and concluding he was not entitled to presumed father status, Father was a mere biological father. A mere biological father's parental rights may be terminated in the absence of an unfitness finding, without violating due process. " '[P]arental rights may be terminated based solely upon the child's best interest and without any requirement for a finding of detriment or unfitness . . . .' [Citations.]" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 933-934.) As Father was not entitled to an unfit-parent finding, there was no due process violation.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.

_____

[9] As set forth extensively *ante*, Father's only remedy since reunification services had been terminated was to file a section 388 motion.

44